# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Colleen J.,

       Plaintiff,

v.

Frank Bisignano,[1]
*Commissioner of Social Security*,

       Defendant.

Case No. 25-cv-01195 (DSD/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Plaintiff Colleen J.'s ("Plaintiff") Complaint seeking judicial review of a final decision by the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB"). (*See generally* Dkt. 1.) Plaintiff has filed a brief asking the Court to vacate the denial of benefits by the Commissioner and remand this case to the Commissioner for further proceedings.[2] (*See* Dkt. 10.)

---

[1]    The Complaint named Leland Dudek, who was the Acting Commissioner of the Social Security Administration when Plaintiff filed her Complaint. (*See* Dkt. 1.) Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano has been substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]    As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

The Commissioner filed a brief opposing Plaintiff's request for relief and asking the Court to affirm the Commissioner's decision. (Dkt. 16.) Plaintiff then filed a reply in support of her request for remand. (Dkt. 18.)

For the reasons stated below, the Court recommends granting Plaintiff's request for remand of the Commissioner's decision (Dkts. 10, 18) and denying the Commissioner's request (Dkt. 16) for dismissal of the Complaint.

## I.    BACKGROUND

On May 1, 2022, Plaintiff filed an application for DIB, alleging a disability beginning April 29, 2022. (R. 88, 188-89).[3] Plaintiff claimed disability due to her bilateral facet arthropathy, anterolisthesis, depression, spinal canal stenosis, and bilateral neural foraminal stenosis. (R. 88.)   Her claim was denied initially and on reconsideration. (R. 96-97, 111-15.) Plaintiff requested a hearing, and on October 11, 2023, Plaintiff appeared for a telephone hearing before Administrative Law Judge Corey Ayling ("the ALJ"). (R. 48-80, 116-17.) The ALJ issued an unfavorable decision on November 29, 2023, finding Plaintiff was not disabled. (R. 30-43.)

---

[3]    The Social Security Administrative Record ("R.") is available at Docket 5.

The ALJ followed the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a) for Plaintiff's DIB claim.[4]  (R. 34-35.)  The ALJ concluded that Plaintiff meets the insured status requirements through December 31, 2027.  (R. 35.)

Following the five-step sequential evaluation process, the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since April 29, 2022, the alleged onset of disability date.  (R. 35.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: lumbar and thoracic degenerative disc disease.  (R. 35.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 37.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to:

---

[4]    The Eighth Circuit described this five-step process that the Commissioner of Social Security as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

> [P]erform light work as defined in 20 CFR 404.1567(b)[5] except the claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance occasionally, as that term is defined in the "SCO"; retains ability to maintain physical equilibrium when on feet, stoop occasionally, kneel occasionally, crouch occasionally, crawl occasionally.

(R. 38.)

The ALJ concluded, based on the above RFC, and the testimony of the vocational expert, that Plaintiff could perform past relevant work as a Senior Claims Manager. (R. 42-43.)

Accordingly, the ALJ deemed Plaintiff not disabled from the date of Plaintiff's April 29, 2022 alleged onset date through the date of the ALJ's decision on November 29, 2023. (R. 30-47.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 19-21.) Plaintiff then commenced this action for judicial review. (Dkt. 1.)

---

[5]    The regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The Court has reviewed the entire administrative record, giving particular attention to the facts and records the parties cited.  The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

On March 2, 2022, Plaintiff underwent an MRI of her lumbar spine.  (R. 293.) Jeff Werner, MD, gave the following impressions of the MRI finding:

1.    At L4-L5, there is moderate loss of disc space height, severe degenerative facet changes, and degenerative grade 1 L4 on L5 anterolisthesis. There is severe spinal canal stenosis at this level and moderate Modic type I degenerative endplate changes involving the apposing endplates.
2.    At L4-L5, there is mild to moderate left neural foraminal stenosis.

(R. 294, 571.)

On April 20, 2022, Plaintiff presented with lower back pain and lower extremity symptoms.  (R. 522.)  Treatment options were discussed with Plaintiff, including corticoid injections in the lumbar region or surgery.  (R. 522.)  Plaintiff opted for the injections.  (R. 522.)  Physician Assistant Leah Schiller reviewed Plaintiff's recent MRI, noting that at L4-L5, there was: moderate loss of disc space height; severe degenerative facet changes; degenerative grade 1 L4 on L5 anterolisthesis; and severe spinal canal stenosis at this level.  (R. 522.)  Plaintiff's surgical history included a cervical vertebral fusion.  (R. 523, 559.)

On May 12, 2022, Plaintiff filled out a function report.  (R. 236.)  In this report, Plaintiff claimed she took care of two small dogs by feeding them and taking them

outside.  (R. 230.)  She also reported no problems with personal cares, except the pain that came with bending and lifting her legs while dressing and bathing herself.  (R. 230.) Plaintiff was able to drive a car and was able to go out of the house by herself twice per week.  (R. 231.)  Plaintiff was also able to prepare meals for herself, where it took her 15 minutes to do so.  (R. 232.)  Plaintiff did light cleaning around the house and laundry (with help) each week.  (R. 232.)  Plaintiff's daily activities involved reading books.  (R. 233.)  Plaintiff reported pain when walking "not far" and that while she did not need to rest, she would need to lie down with ice or heat on her back.  (R. 234.)  Plaintiff took Advil for her pain.  (R. 236.)

On August 16, 2022, state agency consultant George Erhard, MD, based on his review of the available medical record, assessed Plaintiff with a light RFC.  (R. 84.) According to Dr. Erhard, Plaintiff could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds.  (R. 84.)  She had an unlimited ability to push and pull using her upper and lower extremities.  (R. 84.)  Plaintiff could stand or walk about 6 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday.  (R. 85.) Dr. Erhard also found that Plaintiff could never climb ladders or ropes; and could occasionally climb ramps/stairs, balance, stoop, crouch, and crawl.  (R. 85.)  He did not assign any manipulative, visual, communicative or environmental limitations to Plaintiff. (R. 85.)   As part of developing this RFC, Dr. Erhard considered the March 2, 2022 MRI results of Plaintiff's lumbar spine.  (*See* R. 82-83 (listing evidence considered).)

On August 22, 2022, Plaintiff presented with pain and weakness in her back, right hip, right thigh and her right lower leg.  (R. 574.)  Plaintiff rated the pain as 7 out of 10.

(R. 574.)  She described the pain as sharp, throbbing, and worsening.  (R. 574.) Plaintiff's medical provider believed Plaintiff would benefit from transforaminal lumbar interbody fusion with laminectomy.  (R. 574.)  However, she was unable to have the surgery because she could not quit smoking.  (R. 574.)  The assessment for Plaintiff was L4-5 facet arthropathy and degenerative spondylolisthesis with spinal stenosis and low back pain.  (R. 574.)

On September 6, 2022, Plaintiff underwent a bilateral L3-L5 medial branch block (L4-S1 vertebral levels) for her back pain.  (R. 564.)

Plaintiff started physical therapy on September 8, 2022, for the purpose of decreasing her low back pain.  (R. 559-62.)

On September 13, 2022, Plaintiff was seen for her lower back pain to follow-up after receiving a bilateral L3-5 medial branch block, which had provided her with 80% relief at the 3-hour mark.  (R. 553.)  She continued to take Advil, as needed, and had started physical therapy.  (R. 553.)  She rated her pain a 7 out of 10 bilaterally in her lower lumbar back.  (R. 553.)  Plaintiff claimed the pain was always present and worsened with bending.  (R. 554.)  During her examination, Plaintiff demonstrated a normal gait and strength and her range of motion was full, but painful with flexion and extension.  (R. 554.)

On September 20, 2022, Plaintiff underwent a bilateral L3-L5 medial branch block (L4-S1 vertebral levels) for her back pain.  (R. 551.)  Plaintiff reported 90% relief from pain.  (R. 550.)

On October 3, 2022, Plaintiff completed a second function report.  (R. 251-58.) Plaintiff reported taking care of animals by feeding them and taking them outside, with help from her husband.  (R. 252.)  She reported that dressing, bathing, caring for her hair, shaving, feeding herself, and using the toilet was "slow and painful."  (R. 252.)  Plaintiff was able to drive a car and go out by herself once a day.  (R. 254.)  Plaintiff was also able to prepare meals daily, taking about 10 minutes to do so.  (R. 253.)  Plaintiff did laundry and some cleaning.  (R. 253.)  Plaintiff's daily activities involved reading books, and she engaged in gardening and crafts one hour per week.  (R. 256.)  Plaintiff claimed she could not walk more than 200 yards before needing to stop and rest.  (R. 255.)  Plaintiff took Advil for her pain and was using a back brace.  (R. 257-58.)

On October 10, 2022, state agency consultant Gregory Salmi, MD, based on his review of the available medical record, assessed Plaintiff with a light RFC in connection with her request for reconsideration.  (R. 92.)  Plaintiff could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds.  (R. 92.)  She had an unlimited ability to push and pull using her upper and lower extremities.  (R. 92.)  Plaintiff could stand or walk about 6 hours in an 8-hour day and could sit about 6 hours in an 8-hour workday.  (R. 92.)  Dr. Salmi also found that Plaintiff could never climb ladders or ropes; and could occasionally climb ramps/stairs, balance, stoop, crouch, and crawl.  (R. 92.) Dr. Salmi did not assess Plaintiff with any manipulative, visual, communicative or environmental limitations.  (R. 92.)  Similar to Dr. Erhard, Dr. Salmi also considered the March 2, 2022 MRI results of Plaintiff's lumbar spine when determining the RFC.  (R. 89-90.)

On October 25, 2022, Plaintiff underwent a bilateral L3-5 medial branch radio frequency ablation.  (R. 765.)

On December 2, 2022, Plaintiff was seen after receiving no relief from the October 25, 2022 ablation.  (R. 762.)  Plaintiff continued to take Advil for her pain.  (R. 762.)  Plaintiff rated her pain as 9 out of 10 in her lower back and intermittent pain in her left leg.  (R. 762.)  Plaintiff demonstrated a normal gait and strength and her range of motion was full, but painful with flexion and extension.  (R. 763.)

On December 28, 2022, Plaintiff was seen for a follow-up related to her back pain and root injection on December 13 (R. 760), which had provided her with 50% overall relief.  (R. 756.)  Plaintiff rated her pain 5 out of 10 and claimed she was doing well.  (R. 756.)  Plaintiff's gait and strength were normal.  (R. 757.)  Plaintiff's range of lumbar motion was full, but painful with flexion and extension.  (R. 757.)

On April 28, 2023, Plaintiff reported that she had been receiving pain relief injections in her back and that they were starting to hit the right level of pain relief, which she hoped would last.  (R. 691.)

On May 2, 2023, Plaintiff was seen for ear pain.  (R. 958.)  Plaintiff was not in any acute distress, she had no obvious deformity of her musculoskeletal system, could move all four extremities, and she ambulated with a steady gait.  (R. 958.)

On May 24, 2023, Plaintiff reported that she had experienced 70% relief after a bilateral L4 nerve root injection, but had started to have dorsiflexion weakness in her right foot that was likely due to her canal stenosis at the L4-5 level.  (R. 749.)  Given that

her previous lumbar MRI had occurred a year earlier, a new MRI was ordered to check on progression and to determine whether she needed a surgical consult.  (R. 749.)

A second lumbar spine MRI was performed on May 31, 2023, which Dr. Werner compared with the March 2022 MRI (R. 767).  Dr. Werner's findings included:

Nomenclature is based on 5 lumbar type vertebral bodies. Mild rightward convex curvature of the lumbar spine. Lumbar vertebral body heights are maintained. Moderate Modic type I degenerative endplate changes involving the apposing endplates at L4-L5. There are mildly prominent flow voids: The right dorsal aspect of the thoracic spinal cord at the T10-T12 levels. There is a similar appearance on comparison MRI lumbar spine dated 03/02/2022. These were not as evident on more remote comparison imaging from 2019. Normal distal spinal cord and cauda equina with conus medullaris at L1-L2. T2 hyperintense renal cysts. Unremarkable visualized bony pelvis.

T12-L1: Normal disc height and signal. No herniation. Normal facets. No spinal canal or neural foraminal stenosis.

L1-L2: Normal disc height and signal. No herniation. Normal facets. No spinal canal or neural foraminal stenosis.

L2-L3: Disc desiccation and mild loss of disc space height. Mild circumferential disc osteophyte complex. Mild facet arthropathy. No spinal canal stenosis or neural foraminal narrowing.

L3-L4: Disc desiccation. Normal disc space height. Circumferential disc bulge. Mild to moderate degenerative facet changes. No spinal canal stenosis or neural foraminal narrowing.

L4-L5: Disc desiccation and advanced loss of disc space height. Circumferential disc osteophyte complex. Severe degenerative facet changes. Severe spinal canal stenosis. Mild right and moderate left neural foraminal stenosis.

L5-S1: Disc desiccation and mild loss of disc space height. Minimal circumferential disc bulge. Moderate degenerative facet changes. No spinal canal stenosis. Moderate right and no significant left neural foraminal stenosis.

(R. 767-68.)

10

Dr. Werner's impressions of the MRI were as follows:

1. At L4-L5, there is unchanged severe spinal canal stenosis with persistent moderate Modic type I degenerative endplate changes involving the apposing endplates.
2. Mildly prominent flow voids along the right dorsolateral aspect of the thoracic spinal cord at the T10-T12 levels is incompletely evaluated. Thoracic spine MRI with and without contrast is recommended to further evaluate for a vascular malformation.

(R. 768.)

On June 2, 2023, Plaintiff was again seen for her lumbar back pain and to review her May 31, 2023 lumbar MRI results. (R. 744.) Plaintiff had been taking ibuprofen for her pain and reported her pain was 4 out of 10 in her bilateral lower lumbar back with dorsal flexion weakness in her right foot. (R. 744.) Plaintiff denied any increase in weakness. (R. 745.) Plaintiff's gait was normal, and her lower extremity strength was full, except for her dorsiflexion. (R. 745.) Lumbar range of motion was full (except with her dorsiflexion), and she experienced pain with flexion and extension. (R. 745.) The assessment for Plaintiff was lower back pain, lumbar myofascial pain, lumbar spondylosis without myelopathy, L4-5 severe spinal stenosis, and right dorsiflexion weakness. (R. 744.)

On June 5, 2023, Plaintiff underwent an MRI of her thoracic spine. (R. 717-18.) Peter Busselberg, MD, interpreted the MRI as follows:

**INTERPRETATION**: Normal thoracic kyphosis with degenerative endplate disruption/edema at T1-2. Incompletely characterized C5-6 and C6-7 ACDF. Scattered benign intraosseous hemangiomata without vertebral collapse, acute fracture, or destructive osseous lesion. Normal pre and paravertebral soft tissues. Normal thoracic cord signal. Incidental prominent, tortuous vascular structure in the subarachnoid space on the right spanning T8-T12 (series 108, images 23-32; series 100, images 4-49).

11

T12-L1: Normal dorsal disc contours and normal facets.

T11-12: Moderate disc degeneration and mild dorsal annular bulge without central stenosis. Normal facets and patent foramina.

T10-11: Moderate to advanced disc degeneration and mild dorsal annular bulge without central stenosis. Normal facets and patent foramina.

T9-10: Moderate disc degeneration, mild left dorsal annular bulge, and no central stenosis. Mild right facet degeneration patent foramina.

T8-9: Moderate disc degeneration and central annular fissure/1-2 mm AP protrusion without central stenosis. Normal facets and patent foramina.

T7-8: Moderate disc degeneration and mild dorsal annular bulge without central stenosis. Normal facets and patent foramina.

T6-7 through T4-5: Mild disc degeneration, normal dorsal disc contours, normal facets, and no stenosis or impingement.

T3-4: Mild ventral spondylosis, normal dorsal disc contours, mild right facet degeneration, and no stenosis or impingement.

T2-3: Mild ventral spondylosis, mild right dorsal annular bulge, and no central stenosis. Normal facets and patent foramina.

T1-2: Advanced disc degeneration and mild dorsal endplate ridging partially effacing the ventral CSF/mildly flattening the ventral cord, without central stenosis. Normal facets and moderate to severe left/moderate right foraminal stenosis.

C7-T1: Moderate disc degeneration, 4 mm spondylolisthesis, dorsal annular bulge, and mild central stenosis. Moderate right greater than left facet degeneration and moderate bilateral foraminal stenosis.

(R. 717-18.)

Based on his interpretation of the MRI, Dr. Busselberg reached the following conclusions:

Multilevel thoracic degenerative changes with specifics as follows:

12

1.  Tortuous, prominent vascular structure in the right subarachnoid space spanning the T8-T12 vertebral levels without associated cord signal abnormality. This is suspected to represent an incidental prominent vein, and may be correlated with the abnormality identified on the comparison lumbar spine MRI. While a spinal dural arteriovenous fistula could create a similar appearance, spinal cord signal abnormality typically seen with a spinal dural aVF is lacking in this case. If warranted clinically, postcontrast imaging of the thoracic spine could aid in further characterizing.

2.  Facet degeneration which is moderate at C7-T1 right greater than left, in the setting of grade 1 spondylolisthesis infra-adjacent to a cervical fusion.

3.  T1-2 moderate to severe left and moderate right foraminal stenosis.

4.  Scattered shallow dorsal disc/endplate contour abnormalities as described without central stenosis or frank cord impingement.

(R. 718).

On June 13, 2023, Plaintiff was seen for her back pain. (R. 740.) The June 5, 2023 thoracic MRI results were reviewed with Plaintiff. (R. 740.) Plaintiff was taking ibuprofen for her pain and rated her pain 5/6 out of 10. (R. 740.) Her examination showed that she had a normal gait, her lower extremity strength was full, except for her dorsiflexion, she had full sensation, and her range of motion was largely normal (except with her dorsiflexion) but painful with flexion and extension. (R. 741.) Her MRI showed a prominent vein at the thoracic level with no abnormal cord signal. (R. 740.) Plaintiff wanted to see if she was a candidate for an intracept.[6] (R. 740.)

---

[6]   "The Intracept procedure uses radiofrequency energy to heat a narrow point on your basivertebral nerve. That disrupts pain signals that travel from your spine to your brain, offering relief from vertebrogenic pain." *Intracept Procedure*, Cleveland Clinic, https://my.clevelandclinic.org/health/procedures/intracept-procedure [https://perma.cc/5JGB-V36C] (last visited Dec. 18, 2025).

On August 29, 2023, Plaintiff presented at an Allina Heath Clinic to establish care with concerns regarding her low back pain. (R. 642.) The practitioner noted that she followed with Summit Orthopedics for this, but wanted a referral to a spine surgeon for a second opinion. (R. 642.) She had undergone an MRI earlier in the year and was noted to have a "tortured vein in the back, was told she needs surgery but cannot have this done until she stops smoking." (R. 642.) Plaintiff had been relying heavily on ibuprofen, but her most recent labs showed abnormal kidney function, so she had been working to reduce her ibuprofen use as a means of protecting her kidneys. (R. 642.) Plaintiff reported that she had recently quit her job and that not working had been very helpful for her back, as she was not on her feet as much and was able to lie down when necessary. (R. 642.) Plaintiff denied any neck or back pain at the appointment. (R. 644.) Plaintiff's examination showed that she was not in any acute distress and her musculoskeletal examination was normal. (R. 645.) It was discussed with Plaintiff that that neurosurgery was not likely to move forward with surgery while she was smoking, but she nevertheless was referred for a second opinion as she requested. (R. 646.)

On September 5, 2023, Plaintiff was seen for her lower back pain related to her vertebrae. (R. 735.) It was noted that first-line pain treatment for her chronic lumbar pain had failed, and Plaintiff had agreed to move forward with an intracept to the L4 and L5 vertebral bodies. (R. 735.) Plaintiff's June 2, 2023 lumbar MRI results demonstrated disc degeneration in the lumbar spine with inflammatory endplates. (R. 735.) Her examination showed restricted flexion and extension with reproduction of lower back pain. (R. 736.)

At the October 11, 2023 hearing before the ALJ, Plaintiff testified that she had undergone neck surgery many years earlier. (R. 55.) Plaintiff also testified that she treated her pain with Advil. (R. 55.) Plaintiff further testified that she could only sit at a computer for 30 minutes at a time, after which she would have to lie down to reduce the pain. (R. 56.) According to Plaintiff, any kind of sitting, standing, moving or bending forward caused pain in her back and she was lying down 80% of the day. (R. 56, 67.) Plaintiff testified that her lower back pain was her only physical problem. (R. 57.) Plaintiff further testified that she had to miss her previous work 3-5 days a month in order to receive injections for her back pain. (R. 60-62.)

## III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* In reviewing the record for substantial evidence, the Court

15

may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). "Assessing and resolving credibility is a matter properly within the purview of the ALJ." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.")).

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred as a matter of law by "playing doctor" instead of fully developing the record. (Dkt. 10 at 7.) Plaintiff relies on the fact that the ALJ found persuasive the August 16, 2022 opinion of state agency consultant Dr. Erhard, and the October 10, 2022 opinion of state agency consultant Dr. Salmi. (*Id.* at 4-5, 9-10.) Both Dr. Erhard and Dr. Salmi had conducted a review of the available medical record (R. 82-83, 89-90) and concluded the Plaintiff could perform light work with occasional climbing of ramps/stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds (R. 85, 92). They both also concluded that the Plaintiff could stand, walk, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. (R. 85, 92.) Dr. Erhard and Dr. Salmi both identified Plaintiff's March 2, 2022 lumbar MRI results as evidence they considered. (R. 82, 89.) Again, the March 2, 2022 lumbar MRI results stated:

1. At L4-L5, there is moderate loss of disc space height, severe degenerative facet changes, and degenerative grade 1 L4 on L5 anterolisthesis. There is severe spinal canal stenosis at this level and moderate Modic type I degenerative endplate changes involving the apposing endplates.
2. At L4-L5, there is mild to moderate left neural foraminal stenosis.

(R. 294.)

16

Plaintiff's argument focuses on the fact that Dr. Erhard and Dr. Salmi did not consider (because they did not yet exist) the May 31, 2023 lumbar MRI results and the June 5, 2023 thoracic MRI results. (*See* Dkt. 10 at 10-14.) Notably, the May 31, 2023 lumbar MRI results were compared to the March 2, 2022 lumbar MRI results, and resulted in the following findings:

1. At L4-L5, there is unchanged severe spinal canal stenosis with persistent moderate Modic type I degenerative endplate changes involving the apposing endplates.
2. Mildly prominent flow voids along the right dorsolateral aspect of the thoracic spinal cord at the T10-T12 levels is incompletely evaluated. Thoracic spine MRI with and without contrast is recommended to further evaluate for a vascular malformation.

(R. 767-68.)

Based on the recommendation for a thoracic spine MRI, an MRI of Plaintiff's thoracic spine was taken on June 5, 2023, resulting in the following impressions:

Multilevel thoracic degenerative changes with specifics as follows:

1. Tortuous, prominent vascular structure in the right subarachnoid space spanning the T8-T12 vertebral levels without associated cord signal abnormality. This is suspected to represent an incidental prominent vein, and may be correlated with the abnormality identified on the comparison lumbar spine MRI. While a spinal dural arteriovenous fistula could create a similar appearance, spinal cord signal abnormality typically seen with a spinal dural aVF is lacking in this case. If warranted clinically, postcontrast imaging of the thoracic spine could aid in further characterizing.
2. Facet degeneration which is moderate at C7-T1 right greater than left, in the setting of grade 1 spondylolisthesis infra-adjacent to a cervical fusion.
3. T1-2 moderate to severe left and moderate right foraminal stenosis.
4. Scattered shallow dorsal disc/endplate contour abnormalities as described without central stenosis or frank cord impingement.

(R. 718.)

17

According to Plaintiff, when discussing the persuasiveness of Dr. Erhard's and Dr. Salmi's opinions, the ALJ noted that the subsequent evidence did not show a deterioration of her condition but rather stable imaging findings. (Dkt. 10 at 11.) Plaintiff contends that this was legal error requiring remand so that a consultative examination can be performed, because an ALJ may not draw his own inferences about a plaintiff's functional ability from medical reports, especially here where Dr. Erhard and Dr. Salmi had never reviewed the June 5, 2023 thoracic MRI results. (*Id.* at 11-16.)

The Commissioner counters that the ALJ did not interpret the MRI results, but merely relied on the impressions of those records by physicians. (Dkt. 16 at 8.) Defendant also argues that while an ALJ cannot draw their own inferences about a claimant's functional ability simply from medical reports, objective medical findings and other medical evidence can constitute sufficient medical support for an RFC assessment even in the absence of medical opinion evidence. (*Id.*) Defendant also references a 2018 MRI of Plaintiff's thoracic spine (*id.* at 3) and later contends that: "Dr. Erhard and Dr. Salmi had the benefit of reviewing both lumbar and **thoracic** spine scans prior to 2023" (*id.* at 9 (emphasis added)).

In her reply, Plaintiff argues that the ALJ was not qualified to translate the 2023 MRI impressions into functional limitations. (Dkt. 18 at 3.) Plaintiff also disputes the Commissioner's assertion that Dr. Erhard and Dr. Salmi had the benefit of reviewing both lumbar and thoracic spine scans prior to 2023 because there is nothing in the administrative record indicating they reviewed any thoracic spine scan. (*Id.* at 3-4.)

18

A disability claimant has the burden to establish her RFC. *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Id.* (citation modified). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20).

As set forth above, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except the claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance occasionally, as that term is defined in the "SCO"; retains ability to maintain physical equilibrium when on feet, stoop occasionally, kneel occasionally, crouch occasionally, crawl occasionally.

(R. 38.) With respect to medical opinions, the ALJ only addressed Dr. Erhard's and Dr. Salmi's opinions when formulating the RFC:

19

As for medical opinion(s) and prior administrative medical finding(s), I cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. I have fully considered the medical opinions and prior administrative medical findings as follows: George Erhard, MD, general/family practice, opined for the state agency on August 16, 2022, that the claimant was capable of light work with occasional climbing of ramps/stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds (Ex. 1A). Gregory Salmi, MD, family/general practice, opined for the state agency on October 10, 2022, that the claimant was capable of light work with occasional climbing of ramps/stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds (Ex. 3A). I find these persuasive. Both Dr. Erhard are medical doctors and have experience evaluating impairments under the regulations. They are not spinal medicine experts. They did not personally examine the claimant. However, they did review the record. They provided narratives discussing the evidence to support their opinions including imaging and exam findings along with daily activities (Ex. 1A/2-3, 3A/2-4).

(R. 42.)

The ALJ then reasoned:

**Subsequent evidence does not show a deterioration of her condition but rather stable imaging findings.** I find these opinions are detailed and well supported. The underanged also considered if they were consistent with the evidence. They are consistent with the stable imaging findings, observations of generally intact strength, sensation, and no use of an assistive device. They are consistent with the conservative and partially beneficial course of treatment involving physical therapy, injections, and use of medication. They are consistent with her reported daily activities. These opinions are persuasive.

(*Id.* (emphasis added).)

Earlier in the analysis, the ALJ also summarized Dr. Werner's and Dr. Busselberg's findings and impressions/conclusions of the May 31, 2023 lumbar MRI results and the June 5, 2023 thoracic MRI results, then opining: "These imaging findings show a stable spinal condition."  (R. 39-40.)

20

"[A]n ALJ may embrace a state agency . . . consultant's opinion even if it was made before the record was fully developed." *Kuikka v. Berryhill*, No. 17-cv-374 (HB), 2018 WL 1342482, at *10 (D. Minn. Mar. 15, 2018). An ALJ may also find persuasive "the opinion of a state agency medical consultant who did not have access to all of the records, so long as the ALJ conducts an independent review of the evidence and takes into account portions of the record the consultant had not considered." *Id.* . Further, "[t]he interpretation of physicians' findings is a factual matter left to the ALJ's authority." *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016).

Still, an ALJ cannot "play doctor," meaning that an ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own. *See Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009) ("[T]he ALJ's determination [that the claimant's] medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law."); *see also Adamczyk v. Saul*, 817 F. App'x 287, 289 (8th Cir. 2020) (per curiam) ("[T]he ALJ cannot 'play doctor,' meaning that the ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own."); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("An administrative law judge may not draw upon his own inferences from medical reports."). Moreover, the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (citation modified).

Here, the ALJ specifically relied on the May 31, 2023 lumbar MRI results and the June 5, 2023 thoracic MRI results to support his position that Plaintiff's condition had not

21

deteriorated since Dr. Erhard and Dr. Salmi issued their opinions in August and October 2022, respectively, where both relied on the March 2022 MRI of Plaintiff's lumbar spine. (R. 42 ("Subsequent evidence does not show a deterioration of her condition but rather stable imaging findings."); *see also* R. 40 (the ALJ opining, "These imaging findings show a stable spinal condition.").)  The Court finds no error with respect to the ALJ's reliance on the May 31, 2023 lumbar MRI results, which a medical professional expressly compared to the March 2022 lumbar MRI results (*see* R. 767), as the ALJ was not acting as a doctor but merely relying on Dr. Werner's impressions that there was an unchanged severe spinal stenosis[7] (R. 768) relative to the March 2022 lumbar MRI results relied on by Dr. Erhard and Dr. Salmi when formulating an RFC.

The same is not true for the June 5, 2023 thoracic MRI results.  The Commissioner argues that "Dr. Erhard and Dr. Salmi had the benefit of reviewing both lumbar and thoracic spine scans prior to 2023."  (Dkt. 16 at 9.)  As noted by Plaintiff, there is no support for this argument.  Neither Dr. Erhard nor Dr. Salmi listed the 2018 thoracic MRI results in their lists of evidence considered, nor did they refer to any thoracic MRI results when formulating their RFC.  (R. 82-83, 89-91.)  The only MRI referenced by Dr. Erhard and Dr. Salmi was the March 2022 lumbar MRI.[8]  (*Id.*)  Perhaps the ALJ will turn out to

---

[7]  "Spinal stenosis happens when the spaces in the spine narrow and create pressure on the spinal cord and nerve roots."  *Spinal Stenosis*, NIH, https://www.niams.nih.gov/health-topics/spinal-stenosis [https://perma.cc/3BU9-WSFW] (last visited Dec. 1, 2025).

[8]  In addition to the 2018 thoracic MRI results that the Commissioner claims were considered by Dr. Erhard and Dr. Salmi, an MRI was taken of Plaintiff's thoracic and

lumbar spine on February 5, 2019, well before the date Plaintiff's alleged onset of disability of April 2022. (R. 296-97.) The results as to the thoracic spine were as follows:

> Mildly exaggerated thoracic kyphosis with otherwise unremarkable alignment. Vertebral body heights are relatively maintained, with a small Schmorl's node along the inferior endplate of T7. Mild marrow heterogeneity with small osseous hemangiomas at T3, T8, and T9. Small amount of type I Modic endplate degenerative change anteriorly at T6-T7, T10-T11, and T11-T12. Multilevel small anterior marginal osteophytes at T5-T6 through T11-T12. Disc heights are relatively preserved, with very small posterior disc bulges at T7-T8 through T11-T12. This contributes to only multilevel mild spinal canal stenosis. Facet arthropathy in the thoracic spine is minimal. No high-grade neural foraminal stenosis. No cord signal abnormality. Remainder negative.

> * * *

> CONCLUSION:
> THORACIC SPINE:
> 1. Degenerative change in the thoracic spine is overall mild, with no high-grade spinal canal or neural foraminal stenosis at any level. No cord signal abnormality.

(R. 296-97.) But again, neither Dr. Erhard, Dr. Salmi, nor the ALJ mentioned this 2019 MRI. (*See* R. 82-83, 89-91.) In any event, while the Court is not opining as to Plaintiff's medical condition, the Court notes there appears to be a deterioration of Plaintiff's thoracic spine since 2019, based on the results of the June 2023 thoracic MRI results:

> 1. Tortuous, prominent vascular structure in the right subarachnoid space spanning the T8-T12 vertebral levels without associated cord signal abnormality. This is suspected to represent an incidental prominent vein, and may be correlated with the abnormality identified on the comparison lumbar spine MRI. While a spinal dural arteriovenous fistula could create a similar appearance, spinal cord signal abnormality typically seen with a spinal dural aVF is lacking in this case. If warranted clinically, postcontrast imaging of the thoracic spine could aid in further characterizing.
> 2. Facet degeneration which is moderate at C7-T1 right greater than left, in the setting of grade 1 spondylolisthesis infra-adjacent to a cervical fusion.

be correct that the June 5, 2023 thoracic MRI results do not show a deterioration of her condition but rather stable imaging findings.  However, those results (on their face) include multiple references to "moderate" degenerative changes and a moderate right foraminal stenosis.  (R. 717-18.)  Regardless, the ALJ cannot draw his own inferences as to Plaintiff's functional capacity from such complex medical reports as a spinal MRI. *See Combs*, 878 F.3d at 646; *William H. v. O'Malley*, No. 23-CV-1737 (KMM/LIB), 2024 WL 3862679, at *6 (D. Minn. July 29, 2024) ("Even assuming solely for the sake of argument that the ALJ reached this inference by reviewing the object medical testing results and various, unspecified medical records, the ALJ is not permitted to draw such inference based on his review of the medical reports or the results of medical testing."), *R. & R. adopted* 2024 WL 3895779 (D. Minn. Aug. 21, 2024); *Caito v. Saul*, No. 4:20-CV-1727 SRW, 2022 WL 522898, at *9 (E.D. Mo. Feb. 22, 2022) ("Similarly, as to the ALJ's summary of Plaintiff's updated 2019 MRI results, the Court notes these records contain highly technical medical terminology, and the record does not contain any explanation from a physician as to how the impressions may cause physical limitations or affect her ability to maintain employment.  The Eighth Circuit has warned that an ALJ must not substitute his opinions for those of the physician." (citation modified)).

---

3.   T1-2 moderate to severe left and moderate right foraminal stenosis.

4.   Scattered shallow dorsal disc/endplate contour abnormalities as described without central stenosis or frank cord impingement.

(R. 718).

24

The Commissioner argues that an ALJ need not order a consultive examination, as ALJs are permitted to issue decisions without obtaining additional medical evidence, including medical opinion evidence, so long as other evidence in the record provides a sufficient basis for the ALJ's decision. (Dkt. 16 at 8-9 (citing *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019); *Steed v. Astrue*, 524 F.3d 872, 875-76 (8th Cir. 2008).) Neither *Swink* nor *Steed* involved an ALJ who found persuasive RFCs formulated by state agency medical consultants who did not have the benefit of all of the relevant imaging while simultaneously finding a claimant's spinal condition had not deteriorated based on the ALJ's (perhaps incorrect) interpretation of subsequent imaging not considered by the state agency medical consultants. Here, the ALJ relied on the state agency medical consultants' opinions based on 2022 MRI results and then, based on his own review of more recent imaging not considered by those consultants, concluded that Plaintiff's spinal condition had not changed. (R. 40.) This constitutes an impermissible substitution of the ALJ's opinion as to what the June 5, 2023 MRI results show and calls into question whether the RFC assigned by the ALJ is based on substantial evidence. *See Rodney W. v. Kijakazi*, No. 20-CV-50255, 2022 WL 17414958, at *5 (N.D. Ill. Dec. 5, 2022) (dealing with the interpretation by the ALJ of medical imaging and finding that "When an ALJ interprets 'potentially decisive' medical evidence without the aid of medical experts, her decision is not supported by substantial evidence." (citation modified)) .

The Commissioner's reliance on *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555 (6th Cir. 2014) is similarly unpersuasive. (*See* Dkt. 16 at 8). In *Griffith*, the court found that the ALJ did not impermissibly substitute his own medical judgment for those

25

of trained professionals by reviewing and weighing psychological reports from medical records because the record was sufficiently developed by those reports and the data consistently indicated that Griffith had low intelligence and a comparatively higher degree of adaptive functioning, making solicitation of additional medical opinions unnecessary. *Id.* at 562. This case is distinguishable from *Griffith* in that, unlike the psychological reports containing scores and medical providers' opinions as to Griffith's ability to function, no medical professional opined on whether Plaintiff's thoracic spine had degenerated or took into account the June 5, 2023 thoracic MRI results when formulating an RFC. This left the ALJ to improperly infer that the June 5, 2023 thoracic MRI results showed a "stable spinal condition."

Consequently, the Court recommends remand to fully develop the record, including through a consultative examination of Plaintiff and formulation of Plaintiff's RFC based on consideration of all imaging taken during the relevant period.

\* \* \*

For all these reasons, the Court recommends granting Plaintiff's request for remand to the Commissioner and denial of the Commissioner's request that the decision be affirmed.

## V.      RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED** that:

1.      Plaintiff's request for remand to the Commissioner (Dkts. 10, 18) be **GRANTED**;

26

2.      The Commissioner's request (Dkt. 16) for dismissal of the Complaint be

**DENIED**; and

3.      This case be **REMANDED** to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report

and Recommendation

DATED:  January 20, 2026                              *s/Elizabeth Cowan Wright*
                                                      ELIZABETH COWAN WRIGHT
                                                      United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).